## In the Matter of Peter Herdic, Bankrupt.

*(District Court, W. D. Pennsylvania.    February 14, 1880.)*

Bankruptcy—Opposition to Discharge of Bankrupt—Burden of Proof.—Although suspicious circumstances may in certain cases be sufficient to authorize a court to find the concealment or fraudulent appropriation of money by a bankrupt, yet it is well settled that the burden of sustaining specifications of objection to the discharge of a bankrupt rests upon the opposing creditors.

Same—Proper Books of Account—Discharge.—The provision of the bankrupt law which withholds a discharge, "if the bankrupt, being a merchant or tradesman, has not at all times, after the second day of March, 1867, kept proper books of account," applies only to merchants and tradesmen in respect to their business as such merchants and tradesmen.

In bankruptcy, on specifications of opposition to the bankrupt's discharge.

*Henry C. Parsons, H. C. McCormick* and *Mr. Crocker,* for opposing creditors.

*Clinton Lloyd* and *John M. Kennedy,* for the bankrupt.

Acheson, J.    Certain creditors of the bankrupt, Peter Herdic, having filed specifications of opposition to his discharge, they were referred to Frederick E. Smith, Esq., register, with directions to take testimony thereon and make report of the

facts to the court. The register took and returned to the court the testimony offered by the respective parties, and made a report favorable to the bankrupt upon all the specifications.

Upon the coming in of the register's report the case was fully and very ably argued by the counsel of the opposing creditors and of the bankrupt. Since the argument I have attentively read the testimony, and the case has received careful consideration. The circuit judge, McKennan, sat with me at the hearing, and the conclusions I have to announce were reached after consultation with him, and have his approval.

The specifications of opposition are thirteen in number; but the fifth, sixth, seventh, twelfth and thirteenth were not pressed at the argument. In respect to them, therefore, I content myself with saying that the evidence does not sustain them, or any of them.

The first and second specifications relate to the same matter, and may be considered together. They charge, in substance, that the bankrupt "has wilfully sworn falsely" in the affidavit attached to his petition, in this, that in his schedule he returns that he has no real estate in his possession or enjoyment, or which is held by any other person in trust for his use, (except as therein stated,) when in truth and in fact he was interested as the owner of the undivided one-third of certain lands in Potter county, Pennsylvania, then held in trust for him by one Jacob Tome, and which he did not return, but wilfully and fraudulently omitted from his schedule.

The facts relating to these lands are as follows: By deed bearing date October 19, 1872, Jane Phillips conveyed to Jacob Tome, of Port Deposit, Maryland, 12 tracts of land in Potter county, Pennsylvania, containing in the aggregate about 11,385 acres, for the consideration of $45,240. An article of agreement (not recorded) of the same date with this deed was entered into between Jacob Tome, Peter Herdic and A. G. Olmstead, which recites the purchase by these parties of said lands; that Tome had paid in hand one-third the purchase money, and was to pay the residue, which was secured by his mortgage, in one and two years, with interest; that the title was vested in Tome in trust for himself and

Herdic and Olmstead; that the lands were to be sold at such times and prices as the parties should think advisable, and until sold Herdic and Olmstead should pay Tome interest on two-thirds of the amount of each payment of purchase money made by him at the rate of seven per cent. per annum, and each party should pay one-third of the taxes; that when the lands were sold Tome should be first reimbursed the purchase money paid by him, and the balance of the proceeds of sale should then be equally divided between the three parties.

Jacob Tome paid the entire purchase money. Herdic paid his stipulated share of the interest which accrured up to October 19, 1875, but he paid no interest subsequently accruing.

The parties made no sales of any part of these lands. They were never able to dispose of them at an advance, or, indeed, for the price Tome had paid for them.

Herdic being in arrear for his share of the taxes, his interest in said land was sold for taxes at treasurer's sale, on June 10, 1878, and purchased by Jacob Tome, to whom the treasurer of Potter county executed a deed.

Mr. Tome testifies that he and Olmstead have been and are willing to sell these lands at what they cost, and even for less. From the uncontradicted evidence it is manifest that at the time when the bankrupt made his affidavit these lands were not worth the money Jacob Tome had invested in them. The bankrupt's interest in them was, therefore, of no value whatever had it then been redeemed and unencumbered. But it appears that whatever redeemable interest the bankrupt then had was encumbered by unimpeachable liens, amounting to far more than the value of the entire 12 tracts.

In explanation of the omission from his schedule of his interest in these lands, Mr. Herdic testifies: "It had been sold at treasurer's sale, and I didn't think it belonged to me." Under all the circumstances I accept this explanation as reasonable and truthful. Certainly the evidence does not warrant the harsh conclusion that the bankrupt "has wilfully sworn falsely" touching this matter.

The third and fourth specifications relate to the alleged concealment by the bankrupt of certain personal property. The third specification charges that the bankrupt has concealed and failed to deliver to his assignees $25,000 which he received from Jacob Tome a few months before the filing of his petition in bankruptcy. The fourth specification charges the like concealment of and failure to deliver to the assignees the sum of $10,000, which it is charged the bankrupt delivered to his friends to purchase at sheriff's sale, for his use and benefit, his household goods and other property, and that the money was so applied.

It appears that on January 24, 1878, Mr. Herdic received from Jacob Tome the latter's notes for $25,000, given in the purchase of certain bonds issued by the Minnequa Springs Improvement Company. On or about that date Herdic discounted Tome's notes at Philadelphia. Out of the proceeds Herdic paid $10,010.69 to the Manufacturers' National Bank of Philadelphia, in discharge of his indebtedness to that bank. This is proved by John W. Moffly, president of the bank. Mr. Herdic testifies to other proper payments, in discharge of his liabilities, made with the moneys realized from the discount of the Tome notes. After these payments there remained in his hands about $10,400, which he brought to Williamsport. At that time W. F. Reynolds & Co., the plaintiffs in a judgment against Herdic, had an execution for $10,000 in the hands of the sheriff of Lycoming county. This execution had issued January 22, 1878.

Undoubtedly, the evidence shows that it was originally the intention of Mr. Herdic to apply the $10,400 he brought from Philadelphia to the Reynolds execution. But he soon found himself hopelessly pressed by other creditors and abandoned his purpose to pay off Reynolds & Co.'s judgment. He testifies that he applied the whole of the $10,400 to the payment of debts and to the maintenance of his family, and that it was all so used within two months after he got it. To some extent he particularizes his expenditures. It certainly would have been more satisfactory had his testimony on this subject been more explicit. He swears positively, however, that no

part of this money was furnished to friends to be used in purchasing in his property at sheriff's sale, and in this he is not contradicted. It is not pretended that there is any direct evidence that any of the money in question was used for the purchase charged in the fourth specification. But the court is asked to draw such inference. I agree with the learned counsel for the creditors that suspicious circumstances may be so strong as to authorize a court to find the concealment or fraudulent appropriation of money by a bankrupt. But I altogether fail to find such circumstances in this case. It is well settled that the burden of sustaining specifications of objection is upon the opposing creditors. It is always a fair presumption that the bankrupt has acted with integrity.

The eighth specification charges that the bankrupt has wilfully sworn falsely in the affidavit attached to his petition, in that he has wilfully omitted from · his schedule certain amounts received by him on August 26, 1878, to-wit: from J. W. Maynard, $5,000; from Guy W. Maynard & Co., $3,579.42; and from G. W. Maynard & Co., $27,572.67. To sustain this specification the opposing creditors rely upon certain entries in the books of the bankrupt made on said date, whereby the accounts of the persons above named are respectively credited with the sums mentioned. But the evidence is plenary that the bankrupt did not receive, at that time, said sums, or any part thereof. This specification therefore falls. The said entries are part of those which are the foundation of the eleventh specification, and were made under the circumstances and for the purpose hereinafter stated.

The ninth specification charges that the bankrupt, having knowledge that Charles E. Gibson had proved a false and fictitious debt against him of $3,900, did not disclose the same to his assignees within one month after he acquired such knowledge. I am by no means prepared to say that the evidence warrants the conclusion that Gibson's proof of debt is of the character here alleged. But if this ever so clearly appeared, it would be essential to show that the bankrupt had knowledge of the fact in order to sustain this

specification. Of such knowledge on the part of the bankrupt there is no evidence. Gibson's proof, indeed, was sworn to at the office of Mr. Herdic, before Mr. Hinkley, a notary public, who had been, and perhaps then was, in the bankrupt's employ. But it does not appear that Mr. Hinkley had any reason to doubt the correctness of Gibson's claim. Mr. Herdic himself took no part in the preparation of Gibson's proof, did not examine it, and was not consulted with respect to it.

The tenth specification charges that the bankrupt, being a merchant, has not at all times since the second day of March, 1867, kept proper books of account, in that such books do not show what moneys were received and what disposition was made of them. And the eleventh specification charges that he has not kept proper books of account, in that on the twenty-sixth of August, 1878, three days before the filing of his petition in bankruptcy, he caused 15 pages of entries to be made in his day-book of business transactions, amounting to at least one million of dollars, and most of said transactions having occurred several years prior to said entries.

These specifications designate the bankrupt as a "merchant;" and the evidence, I think, does show him to have been a dealer in lumber, as a merchant within the meaning of the bankrupt law. His transactions in lumber seem to have been principally as a partner with other parties, but to some extent he was individually a dealer in lumber. Besides his dealings as a lumber merchant, Mr. Herdic had very large business transactions. He extensively bought and sold real estate, was largely engaged in laying street pavements, and carried on other enterprises of magnitude, which had no connection with his business as a merchant.

The bankrupt law withholds a discharge "if the bankrupt, being a merchant or tradesman, has not at all times, after the second day of March, 1867, kept proper books of account." This requirement applies only to merchants and tradesmen, (Blumenstiel, 521,) and as to them must be understood as requiring the keeping of proper books of account only in respect to the bankrupt's business as a merchant or tradesman.

If he has kept such books he is entitled to his discharge, although he may not have kept proper books of account touching other business transactions. It was strenuously urged at the argument that the bankrupt was not entitled to his discharge because he had kept no cash-book or proper cash account, and authorities were cited to show that the failure by a bankrupt, he being a merchant or tradesman, to keep a cash account, is good ground for refusing his discharge.

The opposing creditors produced in court, and deposited with the clerk, five books of the bankrupt, viz.: One blotter, one day-book, marked "Journal E," one ledger, marked "C," and two bills payable books. But these are a part only of the books kept by the bankrupt. At page 118 of the testimony the register notes an offer of evidence by the creditors of "all the books delivered by Peter Herdic to the assignees," and these are there stated as "Ledgers A, B and C, Journals A, B, C, D and E, book of bills receivable, two books of bills payable, two blotters, and Journal B and Ledger B, labeled 'P. H.'s." But, as I understand the evidence, this formal offer does not embrace all the books of account which the bankrupt kept; for the assignees and Mr. Hinkley testify that still other books of account of the bankrupt, by and with the acquiescence of the assignees, were not delivered into their actual custody, but for safe-keeping were left at Mr. Herdic's office.

Not having before us all the books, it is impossible to decide by inspection whether or not a proper cash account was kept. Resort must therefore be had to the testimony.

The following question and answer appear in the testimony of C. C. Taylor, the book-keeper: *Question.* "Where is the cash-book of Mr. Herdic?" *Answer.* "He didn't keep any." Page 88 of evidence. It will be observed that the witness does not say that Herdic kept no cash *account,* and from his testimony, as a whole, the inference is a fair one that a proper cash account was kept. Upon this subject Mr. Hinkley, an expert in book-keeping, was examined on behalf of the creditors, and was asked by their counsel the following question: "Where is the cash-book of Mr. Peter Herdic?"

To which he answered: "For his individual use he kept no cash-book. For his lumber accounts cash-books were kept. These books are at the office." Page. 58. This witness further testifies: "As I stated before, he had kept lumber books, and that these lumber books are cash-books." Id. Again, in his examination in chief, he was asked: "Did he keep any individual cash account?" To which he answered: "He did in his individual lumber books." Page. 59. In the cross-examination of this witness the following questions and answers occur: *Question.* "Were there regular books of account, cashbooks and others kept, showing his transactions in lumber?" *Answer.* "There were." Page. 62. * * * *Q.* "Were those books properly kept, showing the transactions in lumber, in your judgment as a book-keeper?" *A.* "Yes, sir." This evidence stands uncontradicted.

I now approach what I consider the most doubtful question in the case. On August 26, 1878, three days before the filing of the petition in bankruptcy, by the direction of Mr. Herdic, fifteen pages of entries were made in his books, all under said date, and aggregating considerably more than $1,000,000. Did these entries concern Mr. Herdic's business as a merchant? This, it seems to me, is the vital question, for if they relate to transactions distinct from his business as a lumber merchant, it is immaterial that they were not duly made in the proper course of book-keeping. I fail to discover in the testimony of the witnesses anything to show to what branch of the bankrupt's business the entries in question relate. But an inspection of the books themselves has satisfied me that a large proportion thereof, both as respects number and amount, have no connection whatever with the lumber business, but relate to other matters. As to the nature of many of the entries I can form no opinion. A few seem to have relation to the bankrupt's business as a merchant, but this I cannot affirm certainly.

The evidence, however, does show that the making of these entries was a transaction entirely free from any taint of fraud. The purpose was to close worthless accounts, and old accounts long previously settled, but never entered on the books. The

entries were made after consultation with Register Smith, and under his advice, with a view to excluding from the schedule worthless accounts. It is not shown that the entries in any wise worked injury to the bankrupt's estate or were prejudicial to creditors.

Upon the whole, therefore, I am brought to the conclusion that neither the tenth nor the eleventh specification has been sustained.

The specifications of opposition having been disposed of upon their merits, it has been deemed unnecessary to consider the exceptions thereto filed by the bankrupt.

I am of opinion that all the specifications should be overruled, and the bankrupt granted his discharge, upon the presentation of the register's certificate of his conformity to the provisions of the law.

And it is so ordered.

McKennan, J. I sat at the argument of this case with the district judge, in order that the delay in the final determination of it, which might result from an appeal to the circuit court, might be avoided, The foregoing opinion, therefore, is to be understood as expressing the views of both of us, and as practically deciding the controversy.